SANDS BETHWORKS GAMING,
LLC, Petitioner

v.

PENNSYLVANIA DEPARTMENT OF
REVENUE, and Commonwealth of
Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued June 12, 2008.

Decided July 11, 2008.

Publication Ordered Sept. 24, 2008.

Kevin J. McKeon, Harrisburg, Frederick H. Kraus, Bethlehem, for petitioner.

Thomas J. Gohsler, Asst. Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Before this Court are preliminary objections and a motion to quash filed by the Department of Revenue (Department) to a petition for review invoking both our original and appellate jurisdiction filed by Sands Bethworks Gaming, LLC (Sands) challenging the method by which costs incurred by the Pennsylvania Gaming Control Board (Board) are assessed and the time frame in which payments to local municipalities are calculated. The Department contends that we lack jurisdiction to hear the matters in our original jurisdiction because there is an adequate administrative remedy, and that the appellate matter should be quashed because the Board of Finance and Revenue lacked jurisdiction to hear a pre-enforcement challenge. For the reasons that follow, we sustain the preliminary objections, grant the motion to quash, and dismiss the petition for review.

## I.

## A.

In 2004, the General Assembly enacted the Gaming Act, 4 Pa.C.S. §§ 1101–1904, with the purpose, *inter alia,* of enhancing "live horse racing, breeding programs, entertainment and employment in this Commonwealth." Section 1102 of the Gaming Act, 4 Pa.C.S. § 1102. According to its petition, Sands was issued a "Category 2 License" by the Board on February 1, 2007. Under Section 1401 of the Gaming Act, 4 Pa.C.S. § 1401,[1] slot machine licensees, like Sands, are required to maintain accounts into which certain funds must be deposited. Section 1402 of the Gaming Act, 4 Pa.C.S. § 1402, allows the Department to assess the costs, expenses or payments from each account established under Section 1402 to cover the costs and

---

1. Section 1401 of the Gaming Act provides, in relevant part:

 (a) Account established.—There is established within the State Treasury an account for each slot machine licensee for the deposit of sums under this section.

 (b) Initial deposit of funds.—Not later than two business days prior to the commencement of slot machine operations by a slot machine licensee, the slot machine licensee shall deposit and maintain the sum of $5,000,000 in its account to guarantee the payment of funds to the Commonwealth under this part and as security for its obligations under section 1405 (relating to Pennsylvania Race Horse Development Fund).

 (c) Weekly deposits.—Each slot machine licensee shall deposit funds into its account on a weekly basis equal to the amounts deducted by the department under section 1402 (relating to gross terminal revenue deductions) and for reimbursement of any funds expended due to the slot machine licensee's failure to comply with its obligations under section 1405. The depart-

 ment shall notify each licensee of the amounts deducted. If at any time the amount held in the account attributable to a slot machine licensee is not sufficient to make the payments required of the licensee under section 1402 and for reimbursement of any funds expended due to the slot machine licensee's failure to comply with its obligations under section 1405, the department shall notify the slot machine licensee, and the slot machine licensee shall immediately deposit necessary funds into the account as directed by the department.

 (d) Return of funds.—The funds deposited into its account shall not be returned to a slot machine licensee unless the slot machine licensee ceases conducting business under its license and relinquishes all rights to do so in the future. In that case, the balance of funds in the account attributable to such licensee, minus any unpaid amounts due and payable to the Commonwealth under this part or due and payable under section 1405, shall be returned to the licensee.

expenses of various state agencies enforcing the gaming laws. It provides in relevant part:

(a) Deductions.—After determining the appropriate assessments for each slot machine licensee, the department shall determine costs, expenses or payments from each account established under section 1401 (relating to slot machine licensee deposits). The following costs and expenses shall be transferred to the appropriate agency upon appropriation by the General Assembly:

(1) The costs and expenses to be incurred by the department in administering this part at each slot machine licensee's licensed facility based upon a budget submitted by the department to and approved by the board.

(2) The other costs and expenses to be incurred by the department in administering this part based upon a budget submitted by the department to and approved by the board.

(3) Sums necessary to repay any loans made by the General Fund to the department in connection with carrying out its responsibilities under this part, including the costs of the initial acquisition of the central control computer and any accessories or associated equipment.

(4) The costs and expenses to be incurred by the Pennsylvania State Police and the Office of Attorney General and not otherwise reimbursed under this part in carrying out their respective responsibilities under this part based upon a budget submitted by the Pennsylvania State Police and the Attorney General to and approved by the board.

(5) Sums necessary to repay any loans made by the General Fund to the Pennsylvania State Police in connection with carrying out its responsibilities under this part.

(6) The costs and expenses to be incurred by the board in carrying out its responsibilities under this part based upon a budget approved by the board.

(7) Sums necessary to repay any loans made by the General Fund to the board in connection with carrying out its responsibilities under this part.

To implement Section 1402, the Department promulgated the "Gaming Cash Flow Management Regulations," 61 Pa.Code § 1001.1 – § 1001.11. Addressing administration of the amounts deposited by the licensees to pay Commonwealth gaming-related costs and expenses, 61 Pa.Code § 1001.6(d) provides, in relevant part:

(d) Reimbursement of Commonwealth expenses will be as follows:

(1) The Department will issue to the licensed gaming entity, periodic assessments of expenses incurred by the Board, Department, Office of Attorney General and the Pennsylvania State Police, regarding expenses directly related to the licensed gaming entity, under budgets approved by the Board and upon appropriation by the General Assembly as required in section 1402.1 of the act (relating to itemized budget reporting). Expenses not included in budgets approved by the Board may not be assessed against the licensed entity under this section.

(2) Expenses incurred by the Commonwealth and assessed to the licensed gaming entity shall be charged back to the licensed gaming entity and deducted from the licensed gaming entity's account, as specified in section 1401 of the act (relating to slot machine licensee deposits) and this section.

(3) General administrative costs of the Commonwealth not specifically assessed to a licensed gaming entity under paragraph (1), shall be borne by each licensed gaming entity on *a prorata* ba-

sis, at the discretion of the Secretary of Revenue until all Category 1 and Category 2 licensed gaming entities are operating as permitted under the act. (Emphasis added.)

Before the Gaming Cash Flow Management Regulations were promulgated on July 21, 2007, the Department and Gaming Control Board issued letters on January 29, 2007, and May 14, 2007, to gaming licensees addressing the method that would be used by the Secretary of Revenue to draw against the Section 1401 accounts for administrative expenses. The January 29, 2007 letter stated that the Secretary would draw $800,000 from each licensee's Section 1401 account, and this sum would be treated similarly to the $36.1 million General Fund loan that would be recovered through compensating charges when all licensees were up and running. This letter also stated that the Secretary would continue to draw against each licensee's account at the rate of 1.5% of gross terminal revenue earned retroactive to the date of each licensee's opening.[2]

The Department and Board's next letter, dated May 14, 2007, stated that they intended to continue the procedure from the January 29, 2007 letter, and that the Secretary would continue to draw against each licensee's account at the rate of 1.5% of gross terminal revenue. It also announced that beginning in fiscal year 2007–2008, the Secretary would withdraw the share of the State Police budget allocable

to each licensed entity from that entity's Section 1401 account based on the actual personnel and operating expenses at each venue and its share of headquarter expenses. Finally, it stated that the remaining funding required to cover the budget approved by the General Assembly for the regulatory agencies would be covered by a loan, which would be treated similarly to the existing $36.1 million loan from the Gaming Fund in that it would be recovered from the licensees when all were up and running.

**B.**

The other fee that gaming entities have to pay is to local governments who "host" a gaming facility. Section 1403 of the Gaming Act, 4 Pa.C.S. § 1403, titled "Establishment of State Gaming Fund and net slot machine revenue distribution," requires licensees to pay into the State Gaming Fund an amount based on a tax of its gross terminal revenue and establishes a local share assessment to be paid by the Department via quarterly distributions among the municipalities, including home rule municipalities, hosting a licensed facility. Section 1403(c)(3)(iii) of the Gaming Act requires that a licensee in a city of the third class must pay "2% of the gross terminal revenue or $10,000,000 annually, whichever is greater[.]" 61 Pa.Code § 1001.5(c) sets forth how the local share is to be distributed.[3]

---

**2.** The letter added that gross terminal revenue was calculated by extracting the amount won from the wager received as shown on the daily invoices without excluding promotional play.

**3.** 61 Pa.Code § 1001.5(c) provides:

(1) Distributions of local share assessments to municipalities. If a licensed gaming entity fails to reach the requisite annual minimum distribution as required under the act within 15 days following the end of the

municipality's fiscal year, the Department will notify the licensed gaming entity of the shortfall and the amount to be remitted. A licensed gaming entity shall remit the difference required to meet the requisite annual minimum distribution as required under the act within 15 days following the end of the municipality's fiscal year. The licensed gaming entity shall remit the required payment to the Department for distribution in accordance with the act. Distributions specified in this chapter shall be made by

## C.

On August 20, 2007, Sands submitted a "Petition for Review of Regulations of the Department of Revenue" to the Department's Board of Appeals, in which it challenged 61 Pa.Code § 1001.6(d)(3) contending that it exceeded the Department's statutory authority, was impermissibly vague, constituted an exercise of improper rulemaking, and was inconsistent with the Gaming Act. Sands also asserted that the letters issued by the Department were restrictive, directive and substantive statements leaving no discretion in application which, therefore, created an invalid and improperly promulgated regulation. Finally, Sands contended that the method of assessing the local share assessment in 61 Pa.Code § 1001.5(c)(1) was inconsistent with the Gaming Act. On August 31, 2007, the Department returned to Sands the petition and memorandum of law in support thereof on the basis that the Board of Appeals did not have jurisdiction to consider the petition at the time.

■ Sands next submitted a document entitled "Appeal from the Department of Revenue Board of Appeals Decision Not to Accept Jurisdiction over Petition for Relief." The Board of Finance and Revenue also returned this document to Sands citing a lack of jurisdiction to consider the appeal at the time. Sands then filed the instant petition for review invoking both our original[4] and appellate[5] jurisdiction.[6]

## II.

### A.

In that part of its petition for review invoking our original jurisdiction, Sands raises two counts. In Count I, Sands contends that 61 Pa.Code § 1001.6(d)(3) and the Department's letters create an unfair and arbitrary assessment because it requires a "pro rata" share of all licensee's gross terminal revenue rather than on a "per machine" basis, thereby penalizing those licensees with larger facilities that generate more revenue and forcing them to subsidize smaller facilities that incur the same inherent regulatory costs. Sands further contends that the assessment constitutes an invalid license fee and tax in violation of Article VIII of the Pennsylvania Constitution because it is disproportionate to the cost of administering the slot machine license. Also, Sands argues that the Department's letters and 61 Pa.Code § 1001.6(d)(3) exceed the Gaming Act's delegated authority and its scope because they contain no procedure for the assessment of general regulatory costs before a licensee commences operations and contain no authority for a pro-rata assessment using a percentage of gross terminal revenue.

In Count II of the petition, Sands challenges that 61 Pa.Code § 1001.5(c) is in-

---

the licensed gaming entity to the Department, no later than 15 days from the Department's notice of the shortfall.
(2) Distributions of local share assessments to counties. The Department will make distributions in accordance with section 1403(c)(2) of the act. If the minimum distribution exceeds the applicable annual municipal allocation cap in section 1403(c)(3) of the act, the amount in excess of the municipal allocation cap shall be distributed by the Department in accordance with section 1403(c)(2) of the act.

4. Section 761 of the Judicial Code, 42 Pa.C.S. § 761(a)(1).

5. Section 763 of the Judicial Code, 42 Pa.C.S. § 763.

6. Because the issue [exhaustion of internal administrative remedies] involves a question of law, our scope of review is plenary. *Alliance Home of Carlisle v. Bd. of Assessment Appeals*, 591 Pa. 436, 919 A.2d 206 (2007).

consistent with the Gaming Act because the regulation calculates the annual local share assessment based on the gross terminal revenue earned by a licensee during the host municipality's *fiscal year*, while the Gaming Act provides for an assessed local share tax of the greater of 2 of the gross terminal revenue or $10,000,000 *annually*. Sands contends that 61 Pa.Code § 1001.5(c) creates an abbreviated time frame to determine whether the 2 exceeds the $10,000,000 sum and asserts that this method will lead to inaccurate assessments, specifically in the first year during which licensees will allegedly increase their business by adding additional slot machines after six months of operation. Sands requests that this Court enjoin the assessment under 4 Pa.C.S. § 1404(c) unless it is based on a full 12–month period.

In its preliminary objections, the Department challenges Sands' petition for review in this Court's original jurisdiction, contending that it calls for pre-enforcement review of Department regulations and letters when other adequate administrative remedies are available once the matter is ripe for review.[7]

Because the Department is the state agency responsible for administering the provisions of the Gaming Act relating to reimbursement of agency expenses and their local share of assessments under the Gaming Act, the administrative review process begins with the Board of Appeals. Under 61 Pa.Code § 7.2, the Board of Appeals "will exercise the powers and duties of the Department and the Secretary with respect to the following: (1) The review as authorized by law of determinations, assessments, settlements, credits or refunds, bond requirements or other actions arising under the statutes administered by the Department...." The appeal from that Board of Appeal goes to the Department's Board of Finance and Revenue to address concerns with the Department's letters and regulations, which has the power "to revise any settlement made with any person, association, corporation, body politic, or public officer, by the Department of Revenue, or by the Department of the Auditor General and the Treasury Department" Section 502 of the Fiscal Code,[8] 72 P.S. § 502. Section 503 of the Fiscal Code, 72 P.S. § 503, states that the Board of Finance and Revenue has the power, "to hear and determine any petition for the refund of taxes, license fees, penalties, fines, bonuses or other moneys paid to the Commonwealth and to which the Commonwealth is not rightfully or equitably entitled...." Appeals from Board of Finance and Revenue decisions come to this Court and are heard *de novo* based on the record created before this Court or on stipulated facts. *Farda v. Commonwealth*, 849 A.2d 297 (Pa.Cmwlth. 2004). Pa. R.A.P. 1571(f).

 Relying on *Arsenal Coal Co. v. Department of Environmental Resources*, 505 Pa. 198, 477 A.2d 1333 (1984), Sands' asserts that administrative process does not give it an adequate administrative remedy because it will have to pay those assessments into the Section 1401 accounts before it has an administrative hearing to challenge those regulations. *Arsenal Coal* involved whether equity was available to hear a pre-enforcement challenge to certain regulations of the Department of En-

---

7. In addition, the Department asserts that Sands failed to join a number of indispensable parties, including: 1) the Pennsylvania State Police; 2) the Gaming Board; 3) the 10 other slot machine licensees; and 4) the host municipalities for the slot machine licensees.

Because of the way we have resolved this issue, we need not address that issue.

8. Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§ 502–503.

vironmental Resources even though there was a "post enforcement" remedy available. While it cautioned that normally the administrative process must be followed,[9] *Arsenal* held that a pre-enforcement challenge brought in equity is allowable where the regulation causes actual, present harm. Whether that harm is present is determined by whether "the effect of the challenged regulations upon the industry is direct and immediate, the hardship thus presented suffices to establish the justiciability of the challenge in advance of enforcement." 505 Pa. at 209, 477 A.2d at 1339. In finding that the remedy was not adequate, it focused on the "lengthy process" by which the validity of the regulations would be addressed which would result in "ongoing uncertainty in the day to day business operations of an industry which the General Assembly clearly intended to protect from unnecessary upheaval." *Id.* at 210, 477 A.2d at 1340. In *Concerned Citizens of Chestnuthill Township v. Department of Environmental Resources*, 158 Pa.Cmwlth. 248, 632 A.2d 1, 3 (1993), this Court summarized the Supreme Court's position in *Arsenal Coal* as follows: "In other words, unless the regulation itself is self-executing, there is no harm done to the litigant until the [Department of Environmental Resources] takes some action to apply and enforce its regulations, in which case the normal post-enforcement review process is deemed an adequate remedy."

■ In this case, all that Sands is complaining about is money—there is no claim that the Department's action will cause its gaming facility to operate any differently, that there is any uncertainty in the way it is conducting its operation, or that refunds cannot be ordered if it is successful in its claim that the calculation of administrative expenses unconstitutionally discriminates against it. Moreover, no harm, let alone direct and immediate harm, has even been alleged. In its Count I claim, Sands contends that the 61 Pa.Code § 1001.6(d)(3) calculation of the share of general administrative costs each gaming facility has to pay based on a pro rata share of revenues is unfair, forcing more profitable licensees to pay a greater sum for administrative costs, effectively subsidizing the administrative costs of the smaller gaming entities. Any such claim is wildly speculative since Sands is not yet in business and will not be in business until the second quarter of 2009. Because it is not yet operating, it is impossible to know whether the lynchpin of Sand's claim—that it will be more profitable than the other licensees—is supportable.

Moreover, once Sands begins to operate, its gross terminal revenue for the appropriate period can be calculated, and the Department can levy the assessment for administrative expenses with respect to Sands. At that point, Sands' revenues and the revenues of other gaming facilities would be known, allowing the fact finder to make an informed decision of whether the pro rata method of calculating expenses disproportionately requires Sands to pay

9. "It is fundamental that prior to resorting to judicial remedies, litigants must exhaust all the adequate and available administrative remedies." *County of Berks, ex rel. Baldwin v. Pennsylvania Labor Relations Board,* 544 Pa. 541, 678 A.2d 355 (1996). "Even where a constitutional question is presented, it remains the rule that a litigant must ordinarily follow statutorily-prescribed remedies." *Muir v. Alexander,* 858 A.2d 653, 660 (Pa. Cmwlth.2004). "The additional element required to confer equitable jurisdiction is either the absence of a statutorily-prescribed remedy or, if such a remedy exists, then a showing of its inadequacy in the circumstances." *Id.* (quoting *Borough of Green Tree v. Board of Property Assessments, Appeals and Review of Allegheny County,* 459 Pa. 268, 328 A.2d 819, 823 (1974)).

more of the enforcement agencies expenses. When that occurs, the post-enforcement administrative remedy would be more adequate because all that it involves is the refund of any funds found to be excessive.

Similarly, in Count II, Sands challenges 61 Pa.Code § 1001.5(c)(1) as impermissibly vague and inconsistent with the Gaming Act due to the time frame during which the gross terminal revenue is required to be calculated. Section 1404(c)(3)(iii) of the Gaming Act, 4 Pa.C.S. § 1403, states: "[t]o a city of the third class hosting a licensed facility ... 2% of the gross terminal revenue or $10,000,000 *annually*, whichever is greater, shall be paid by each licensed gaming entity operating a licensed facility located in that city[.]" (Emphasis added.) Section 1001.5(c)(1), 61 Pa.Code § 1001.5(c)(1), provides:

> Upon imposition of the annual minimum distribution amount, as specified in section 1403(c)(3) of the act (relating to establishment of State Gaming Fund and net slot machine revenue distribution), regardless of whether the minimum is subject to the budgetary limitations of section 1403 of the act, the required minimum shall be prorated for that portion of the municipality's *fiscal year* that the Board determines that the licensed gaming entity was actually in operation. (Emphasis added).

Sands provided an exhibit, which was attached to the petition, to demonstrate the potential harm it would allegedly suffer under 61 Pa.Code § 1001.5(c)(1). Notably, the exhibit itself is based on a series of assumptions. For example, the exhibit assumes: 1) the hypothetical licensee opens operations in the last quarter of 2008 with 3,000 slot machines; 2) the respective municipality operates under a calendar year fiscal year; 3) the licensee increases its slot machines to 5,000 in the

first quarter of 2009; and 4) the fourth quarter of 2009 has the lowest revenue of the year. (*See* Exhibit D of Sands' petition for review.) The mere existence of these four assumptions to demonstrate the way the regulation may affect Sands once it is applied effectively displays the reasons why pre-enforcement review is also inappropriate. In order for this regulation to impact Sands, numerous other factors must be present. This scenario cannot be said to cause Sands "direct and immediate harm" under the prevailing pre-enforcement analysis as it is entirely speculative. Again, the proper means of addressing these types of concerns would be to petition the Board of Appeals after commencing operations for a year in the municipality and after the respective sums have been calculated by the Gaming Board and Department. Therefore, we sustain the Department's preliminary objections as to Counts I and II of the petition for review in this Court's original jurisdiction.

### III.

■ The Department has filed an application to quash Sands' appeal in which it challenges this Court's appellate jurisdiction by asserting that it is not ripe for statutory or administrative review and that the Department's letters and regulations do not constitute final orders under Pa. R.A.P. 341(a). In its letter to Sands, the Board of Appeals stated that it "did not have jurisdiction to consider the petition at this time." (*See* Exhibit D, petition for review.) In a November 9, 2007 letter, the Board of Finance and Revenue also stated that it did not have jurisdiction to consider the petition at that time and added, "[i]nsofar as this matter is not properly before the Board, a final written order will not be rendered." (Sands' Exhibit E, petition for review.) The Board of Finance and Revenue letter is, in effect, a written order

dismissing Sands' appeal because it and the Board of Appeals lacked jurisdiction over the matter. Accordingly, we will deny the Department's motion to quash and address the issue of whether the Board of Finance and Revenue had jurisdiction to hear Sands' appeal from the Board of Appeal's refusal to hear the matter, again based on its lack of jurisdiction.

Sands contends that the Board of Appeals did have jurisdiction to review regulations promulgated by the Department because 61 Pa.Code § 7.2 provides, in relevant part, that it has the power to: "(1) ... review as authorized by law ... determinations, assessments, settlements, credits or refunds, bond requirements or *other actions* arising under the statute administered by the Department." (Emphasis added.) Specifically, Sands contends that the term "other actions" includes actions such as the promulgation of regulations and the issuance of letters. We disagree because "other actions" do not include the promulgation of general policies or regulations, but only adjudications affecting the specific rights of a party. Similarly, nothing in Sections 502 and 503 of the Fiscal Code, 72 P.S. §§ 502–503, gives the Board of Finance and Revenue the ability to rule on the validity of departmental regulations or letters without initial action by the Department to create an actual assessment, determination or decision regarding a person or entity.

Because this Court does not have original jurisdiction to the pre-enforcement challenge because there is a full and complete adequate administrative remedy, and the Board of Finance and Revenue lacks the authority to hear pre-enforcement challenges to departmental policies or regulation, the Department's preliminary objections are sustained as to the original jurisdiction portion of the petition, and the Board of Finance and Revenue's decision that it lacked jurisdiction to hear the administrative appeals is affirmed.

## ORDER

AND NOW, this 11th day of July, 2008, the Department of Revenue's preliminary objections are sustained, the motion to quash appeal is denied, and the Board of Finance and Revenue's decision finding that it did not have jurisdiction is affirmed. Petitioner's petition for review is dismissed.