# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The City of Clairton, PA   :
  :
  v.   :
  :
Zoning Hearing Board of the City of   :
Clairton, PA, and Cornerstone   :
Residence, Inc.   :
  :
Cornerstone Residence, Inc.   :
  :   No. 1757 C.D. 2019
  v.   :
  :   Argued: May 15, 2020
Zoning Hearing Board of the City of   :
Clairton, PA and George Glagola,   :
City of Clairton Zoning Officer   :
  :
Appeal of: City of Clairton, PA and   :
George Glagola   :


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
     HONORABLE MICHAEL H. WOJCIK, Judge
     HONORABLE ELLEN CEISLER, Judge


OPINION BY
JUDGE McCULLOUGH         FILED: February 4, 2021


  The City of Clairton (City) and George Glagola (Zoning Officer) (collectively, Appellants)[1] appeal from the October 29, 2019 order of the Court of Common Pleas of Allegheny County (trial court),[2] which determined that Cornerstone

---

[1] Appellants filed a joint brief.

[2] The trial court judge was esteemed former President and now Senior Judge Joseph M. James.

Residence, Inc.'s (Cornerstone) proposed use of certain property located within the City was permitted as a single-family use under the Zoning Ordinance of the City of Clairton (Ordinance), Clairton, Pennsylvania, Ordinance §§337-1 – 337-9 (2016).

## I.    Background

This case is now before this Court a second time, following our remand to the trial court in *City of Clairton v. Zoning Hearing Board of the City of Clairton* (Pa. Cmwlth., No. 1525 C.D. 2018, filed May 31, 2019) (unreported) (*City of Clairton I*). The background that was before us in *City of Clairton I* is presently the same. Accordingly, we repeat the relevant facts and procedural history as described in *City of Clairton I*.

> Cornerstone owns a property located at 622 Delaware Avenue in the City (Property). As noted by the trial court, and based on Cornerstone's application, the Property is located in a residential area, zoned as an R-2 medium density zoning district. The Property consists of a single-family dwelling, which is a permitted use in the R-2 zoning district. Cornerstone sought to utilize the Property to provide residential living in a single-family setting to those who are disabled, as defined by the Fair Housing Amendments Act of 1988 (Fair Housing Act),[3] and in need of such residence to live independently as they recover from drug and/or alcohol addiction. ([First] Trial court op. at 1-2.)
>
> On December 14, 2017, Cornerstone filed an application with the City's Zoning Officer seeking an occupancy permit for a single-family dwelling on the Property. Cornerstone's application reveals that the Property contains a former church and rectory and that Cornerstone only sought to

___
[3] 42 U.S.C. §§3601-3631.

utilize the former rectory for a sober living residence that will house 8 to 10 disabled residents along with a house manager and will be funded in part by charges to the residents for expenses. The Zoning Officer took no action and on January 17, 2018, Cornerstone filed a notice of appeal with the City's Zoning Hearing Board (Board). In its notice of appeal, Cornerstone alternatively suggested that if its use could not be considered a single-family dwelling, but instead a group home, the Fair Housing Act permits occupancy by persons with disabilities as a single family and, hence, it would still be a permissible use in the R-2 zoning district.

However, the Board failed to conduct a hearing within 60 days as required by section 908(1.2) of the [Pennsylvania] Municipalities Planning Code (MPC).[4] On April 25, 2018, Cornerstone filed a complaint in mandamus against the Board seeking a deemed approval. At the same time, Cornerstone provided public notice of the deemed approval through newspaper advertisements and a posting on the premises. The City responded by filing a land use appeal with the trial court.

\* \* \*

The trial court did not take any additional evidence. Following briefing and oral argument, the trial court issued a decision on October 30, 2018, holding that Cornerstone's application was deemed approved. Because Cornerstone represented to the trial court during oral argument that it had no intention of permitting any residents to live at the Property who were confined there by court order, the trial court included this as an express condition of the deemed approval. The trial court reasoned that the Board's failure to conduct a hearing within 60 days resulted in a deemed approval of Cornerstone's application. The trial court rejected the City's argument that the Board lacked jurisdiction because Cornerstone actually sought a conditional use as a group

---

[4] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §10908(1.2).

home, noting that the Board had jurisdiction under section 909.1(a)(3) of the MPC[5] over appeals from the determination of a zoning officer, including the failure to act on an application. The trial court relied on this Court's decision in *Gibraltar Rock, Inc. v. New Hanover Township Zoning Hearing Board*, 68 A.3d 1012, 1018 (Pa. Cmwlth. 2013), wherein we stated that when an applicant seeks deemed approval of a zoning application, "[t]he merits of the application are irrelevant; a board's inaction will subject it to a writ of mandamus ordering a deemed decision."[] ([First] Trial court op. at 2-4.) The City thereafter filed a notice of appeal with this Court.

*City of Clairton I*, slip op. at 2-4 (internal citations altered or omitted). In *City of Clairton I*, we first addressed whether the trial court applied the incorrect standard of review with regard to the deemed approval, and in so doing, concluded that the trial court erred in failing to conduct a *de novo* review, and ordered it to do so on remand. *See, e.g.*, *DeSantis v. Zoning Hearing Board of City of Aliquippa*, 53 A.3d 959, 962 (Pa. Cmwlth. 2012) (vacating the common pleas court's order because it "erred in conducting appellate, as opposed to *de novo*, review of the Board's deemed approval"); *Ulsh v. Zoning Hearing Board*, 22 A.3d 244, 252 (Pa. Cmwlth. 2011) (reversing the common pleas court because it failed to make substantive findings of fact to support its decision to reverse the deemed approval of a variance). Next, we addressed whether the trial court lacked jurisdiction over the application because Cornerstone failed to exhaust administrative remedies by failing to go before the City's Planning Commission and City Council to have its application approved as a conditional use or because Cornerstone's appeal to the Board was premature. On this point, we declined to make a determination and directed the trial court to make findings of fact and

_____

[5] Added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10909.1(a)(3).

4

conclusions of law with regard to these issues. Related to this question, the trial court was to address the Board's jurisdiction over the appeal from the Zoning Officer.

In vacating and remanding the trial court's decision, we specifically directed the trial court to:

1. "[F]irst address the City's claim that Cornerstone's appeal of the Zoning Officer's decision to the Board was premature."

2. "If [it] rejects this argument by the City, it must [then] address the type of use sought herein by Cornerstone, *i.e.*, a single-family or group home use, the latter being subject to a different procedural posture which would require Cornerstone to exhaust its administrative remedies related thereto."

3. "If the trial court accepts the proposed use as a single-family residential dwelling, it must then apply the proper standard of review and consider the City's appeal of the Board's deemed approval *de novo*, *i.e.*, issue its own findings of fact and conclusions of law with respect to the merits of Cornerstone's application." We also directed the trial court, "in considering this issue [to] address the impact, if any, of the Fair Housing Act on Cornerstone's application."

*City of Clairton I*, slip op. 12-13. Following our remand, the trial court, without holding a hearing or otherwise taking evidence, issued findings of facts and conclusions of law on October 29, 2019. (Trial court op. at 1.)[6] The trial court found that the City failed to respond to Cornerstone's December 14, 2017 application, and that 34 days had passed between the filing of the application and the January 17, 2018

---

[6] The trial court did not number the pages on its decision, and thus, we have numbered the pages of its decision from 1 through 3 beginning on the first page with the sentence that starts "[o]n May 31, 2018 . . ." and ending on the third page with ". . . of single-family use." (Trial court op. at 1, 3.)

appeal. (Trial court op. at 2.) The trial court found that the Board failed to conduct a hearing within 60 days of the appeal, and that Cornerstone did not agree to an extension of time for the Board to conduct a hearing, and therefore, the application was deemed approved pursuant to section 908(9) of the MPC, 53 P.S. §10908(9). *Id.*

The trial court also concluded that Cornerstone's proposed use of the Property does not fall within the definition of a group home as defined under section 337-12 of the Ordinance. Conversely, the trial court concluded that the proposed use met the definition of a single-family dwelling as defined in section 337-12 of the Ordinance, explaining that

> [Cornerstone's] role is to provide a single-family dwelling ensuring that all residents are in recovery, in need of this residence to support their recovery and are meeting residence standards including that residents are living together as a family and providing needed support for each other. Cornerstone provided evidence that residents will have their own bedrooms but will share all other living spaces, responsibilities[,] and activities. Residents are expected to live together for a substantial period of time or even permanently because addiction recovery is lifelong. The [c]ourt finds that this type of communal living, sharing of meals[,] and the responsibility of preparing meals in a single kitchen falls under the definition of family. The single-family dwelling use is permitted in the R-2 zoning district and would not be detrimental to the neighborhood.

(Trial court op. at 3.) With regard to the impact of the Fair Housing Act, the trial court concluded that the Fair Housing Act treats individuals who are recovering from alcohol and/or drug addiction and are abstaining from use as "individuals who are substantially limited in carrying out one or more major life activities including the ability to live independently or with one's family. 42 U.S.C. §3601(h)." *Id.* The trial court concluded that the definition of family in section 337-12 of the Ordinance states that

6

restrictions regarding the number of unrelated individuals living together does not apply to persons defined as disabled under the Fair Housing Act. *Id*. Thus, the trial court concluded that the proposed use fits the definition of a single-family use. *Id*. Appellants subsequently appealed to this Court. After the appeal was docketed in this Court, on April 27, 2019, we ordered the parties to file supplemental briefs on whether Cornerstone's appeal from the Zoning Officer was premature and the legal consequence of the appeal if it was premature.[7]

## II. Discussion

On appeal,[8] Appellants raise three issues. First, whether the trial court erred in failing to apply the correct standard of review in reviewing the merits of Cornerstone's application following a deemed approval. Second, whether the trial court erred in determining that the proposed use in Cornerstone's occupancy permit qualified as single-family dwelling as defined by the Ordinance. Lastly, whether the

---

[7] This Court ordered supplemental briefing because, even though it was unmistakably directed to do so on remand, the trial court failed to address the issue of prematurity, and because the parties failed to adequately address the issue in their briefs.

[8] Whether an incorrect legal standard was applied is a question of law, and, as such, an appellate court's standard of review is *de novo* and the scope of review is plenary. *Braun v. Wal-Mart Stores, Inc.*, 106 A.3d 656, 663 n.8 (Pa. 2014). The issues regarding exhaustion of remedies, interpretation of the MPC, and whether a proposed use falls within a given category specified in a zoning ordinance similarly involve questions of law for which the same standard of review applies. *See Newtown Square East, L.P. v. Township of Newtown*, 101 A.3d 37, 42 (Pa. 2014) ("To the extent that [the] issues before this Court rest on interpretation of the MPC, they present a [question] of law for which our standard of review is *de novo* and our scope is plenary."); *Sands Bethworks Gaming, LLC v. Pennsylvania Department of Revenue*, 958 A.2d 125, 129 n.6 (Pa. Cmwlth. 2008), *aff'd*, 968 A.2d 763 (Pa. 2009) ("Because the issue [of exhaustion of internal administrative remedies] involves a question of law, our scope of review is plenary."); *Tennyson v. Zoning Hearing Board*, 952 A.2d 739, 744-45 (Pa. Cmwlth. 2008) ("Whether a proposed use, as factually described in an application or in testimony, falls within a given category specified in a zoning ordinance is a question of law . . . . Thus, our review is plenary.").

7

trial court erred in affirming the deemed approval of Cornerstone's application because Cornerstone failed to exhaust administrative remedies by failing to present its application to the Planning Commission and City Council or by filing a premature appeal to the Board.

With regard to the first issue, the City maintains that the trial court erred by failing to apply a *de novo* standard of review. In support, the City argues that the trial court's order failed to cast aside the notion of a deemed approval. The City points to the portion of trial court's order which states that "it is hereby [o]rdered that the deemed approval of the single-family dwelling occupancy permit is affirmed." (City's Br. at 13 (citing Trial court's 10/29/19 order).) The City posits that the "affirming and dismissing language" used by the trial court is indicative of "appellate review" and is evidence that the trial court accordingly erred by conducting review under an appellate standard. (City's Br. at 13.) In further support, the City argues that the trial court's opinion fails to cite any law articulating the *de novo* standard of review and instead the trial court remained fixated on the deemed approval. Third, the City argues that there is no record of any proceedings below and that the only evidence at issue is Cornerstone's application and its notice of appeal letter to the Board, and that the trial court could not have conducted a *de novo* review on these documents. Nevertheless, the City recognizes that there was an agreement between the parties that no additional evidence was needed to resolve this case.

With regard to the second issue, the City argues that the proposed use in Cornerstone's application does not fit the Ordinance's definition of a single-family dwelling. The City points out that Cornerstone's proposal to have 8 to 10 unrelated individuals reside on the Property is an attempt to invoke the Ordinance's Fair Housing Act exemption to permit more than five unrelated persons to live in a single-family

8

dwelling. However, the City posits that Cornerstone failed to identify actual persons with disabilities and did not articulate any admission criteria. Moreover, the City also argues that the proposed use does not qualify as a single-family dwelling because Cornerstone wishes to "operate" a "sober living residence for men recovering from addiction," the Property will house eight to ten "disabled residents," "oversight" will be provided by Cornerstone, a house manager will be present, residents will be charged for "expenses as necessary," and residence in the dwelling is expected to be for a "substantial period or permanent." (City's Br. at 18 (citing Reproduced Record (R.R.) at 14a-16a).) The City maintains that the trial court erred in failing to address these characteristics and erroneously relied on the statements in Cornerstone's application related to food preparation and meal time. The City argues that the proposed use does not fit the definition of a single-family dwelling, but is instead a business enterprise for the treatment and rehabilitation of persons recovering from drug or alcohol use.

As to the final issue raised on appeal, the City argues that Cornerstone's application should not be approved because it filed a premature appeal to the Board. The City points out that Cornerstone appealed to the Board on January 17, 2018, just 34 days after it submitted its December 14, 2017 application to the Zoning Officer. The City argues that the Ordinance does not require the Zoning Officer to act on an application within any specified time period, and therefore, the appeal was premature.

In its supplemental brief on this issue, the City maintains that the Zoning Officer was under no obligation to render a decision within a 30- or 34-day period, and that a zoning officer cannot fail to act when there is no corresponding duty to act within a 30- or 34-day time frame. The City maintains that the Ordinance requires multiple reviews of a zoning occupancy permit before the permit can be issued. The City argues that as a prerequisite to obtaining an occupancy permit, an applicant must obtain a

9

certificate of occupancy, as required under section 403.65(a) of the Uniform Construction Code,[9] which states that a "residential building may not be used or occupied without a certificate of occupancy issued by a building code official." (City's Suppl. Br. at 3 (citing 34 Pa. Code §403.65(a)).) Next, a building code official is required to "issue a certificate of occupancy after receipt of a full inspection report that indicates compliance with the Uniform Construction Code and [O]rdinance within 5 business days or within 10 business days in cities of the first class." (City's Suppl. Br. at 3 (citing 34 Pa. Code §403.65(b); 35 P.S. §7210.502(a)(1)[10]) (emphasis omitted)). Accordingly, the City argues that the timing with regard to the first step depends on the building code officer's receipt of a final inspection report.

Furthermore, the City points out that before a permit can be issued, the Zoning Officer must independently ensure that the requirements of the Ordinance are met, and if so, then issue the permit under section 337-39(B) of the Ordinance. As pointed about above, the City reiterates that there is not a specific time prescribed in the Ordinance by which the Zoning Officer must issue an occupancy permit and that the Zoning Officer cannot issue an occupancy permit if the building code officer does not issue a certificate of occupancy. Relatedly, the City argues that nothing in the record indicates that a final inspection report was received by the building code officer, and therefore, the building code officer was not obligated to issue a certificate of occupancy, which would have triggered the Zoning Officer's capability to issue an occupancy permit.

_____

[9] 34 Pa. Code §§401.1-405.42.

[10] Section 502(a)(1) of the Act of November 10, 1999, P.L. 491 *as amended*, 35 P.S. §7210.502(a)(1).

10

Finally, the City argues that the consequence of a premature appeal is akin to the failure to exhaust administrative remedies. The City maintains that the exhaustion of remedies doctrine is jurisdictional in nature, and applies to the statutory and administrative procedures under the MPC.

In regard to the first issue raised on appeal, Cornerstone argues that the trial court applied a *de novo* standard of review by issuing its own findings of fact and conclusions of law. Specifically, Cornerstone argues that the facts set out in its application and accompanying statements were sufficient evidence upon which the trial court could conduct its review. Cornerstone argues that the parties agreed before the trial court that no further evidence was needed to resolve the matter, and as such, submitted proposed findings of fact and conclusions of law.

In support of the second issue raised on appeal. Cornerstone argues that the trial court correctly determined that the proposed use qualified as a single-family use. Cornerstone maintains that the individuals who will be living on the Property will be handicapped as defined by the Fair Housing Act, and therefore, the restriction on five unrelated individuals living together under the Ordinance's definition of family does not apply. Furthermore, Cornerstone argues that the manner in which the individuals will live together is indicative of a single-family use, specifically, the sharing of common space, the sharing of household responsibilities, and the sharing of support. Cornerstone maintains that the oversight and charges for expenses do not preclude the proposed use from meeting the definition of a single-family use, because oversight and monetary charges are consistent with traditional family life. Specifically, Cornerstone argues that the charging for expenses is equivalent to adult members being expected to contribute to household costs in a traditional family, and that oversight is the functional equivalent of tasks routinely provided by the head of a household in a

11

traditional family. Citing *McKivitz v. Township of Stowe*, 769 F. Supp. 2d 803, 822 (W.D. Pa. 2010), Cornerstone explains that even though specific individuals have not been identified, whether someone is disabled under the Fair Housing Act can be determined by reference to admission criteria.

With regard to the final issue raised on appeal, Cornerstone maintains that pursuant to the Ordinance, all applications for a zoning occupancy permit must be submitted to the Zoning Officer and that Cornerstone's application for an occupancy permit was no exception. Cornerstone maintains that the MPC provides the Board with the power to review the Zoning Officer's failure to act, and that the Ordinance cannot alter this by failing to prescribe a specific amount of time for the Zoning Officer to act. Cornerstone argues that it was not unreasonable for the trial court to conclude that 34 days with no response constituted a failure to act, and therefore, its appeal to the Board was not premature.

In its supplemental brief, Cornerstone maintains that under section 909.1(a)(3) of the MPC, 53 P.S. §10909.1(a)(3), and section 337.49 of the Ordinance, the Board has jurisdiction over appeals from the Zoning Officer's failure to act. However, Cornerstone's counsel candidly admits that neither the MPC, the Ordinance, nor case law has defined when a failure to act occurs, such that the period during which an appeal may be timely filed commences. Accordingly, Cornerstone argues that this Court should rely on principles of statutory construction, and consider other statutes on the same or similar subjects. In this regard, Cornerstone draws a distinction between sections 337.40 and 337.41 of the Ordinance. Cornerstone argues that the present case involves section 337.41 of the Ordinance because it applied for a zoning occupancy permit, and the 60-day time period prescribed in section 337.40 applies only to a zoning permit application. Furthermore, Cornerstone argues that unlike the complicated

12

review scheme required for a zoning permit, a zoning occupancy permit requires a simple review to ensure that the property is in compliance with the Ordinance.

In further support of its argument, Cornerstone maintains that our Supreme Court has acknowledged that the purpose of the MPC "is to prevent 'inertia' or 'slothful inattention' from effectively preventing needed structures 'through the simple process . . . of (delay).'" (Cornerstone's Suppl. Br. at 4 (quoting *Garchinsky v. Borough of Clifton Heights*, 263 A.2d 467, 469-70 (Pa. 1970)) (omission in original). Cornerstone also argues that under our decision in *Nextel Partners, Inc., v. Clarks Summit Borough/Clarks Summit Borough Council*, 958 A.3d 587, 593 (Pa. Cmwlth. 2008), this Court "recognized a standard of municipal performance in the land development context as measured by its conduct." (Cornerstone's Suppl. Br. at 5.) In addition, Cornerstone points to the Third Circuit Court of Appeals' decision in *Nextel Partners Inc. v. Kingston Township*, 286 F.3d 687, 692 (3d Cir. 2002), and extraterritorial statutory authority from the state of Maine for the proposition that the Zoning Officer was required to act within a reasonable time.

As for the consequence of the premature appeal, Cornerstone also maintains that there is no legal authority on this issue, but maintains that the MPC should be interpreted to

> allow the appeal to go forward when the date the appeal period commences is in doubt and there is no statutory or regulatory standard as to this, or, alternatively, allow an appeal based on failure to act to go forward but permit this to be cured, so that the appeal may become moot or better adjudicated, would further the purposes of the MPC to permit the development of one's property and prevent delay.

(Cornerstone's Suppl. Br. at 9.) Moreover, Cornerstone maintains that due process requires a timely procedure that allows a party to object to the deprivation of one's

property which is not vague or without standard. It argues that in the absence of an ascertainable and certain standard, an individual's rights are threatened.

As to the first issue, the Board argues that the trial court erred as a matter of law in determining that Cornerstone's application was deemed approved. The Board maintains that the trial court failed to review the merits of the application or issue findings of fact and conclusions of law and that the trial court's opinion simply found that the application was deemed approved.

As to the second issue, the Board maintains that had the trial court actually reviewed the merits it would have found that the proposed use would not qualify as a single-family use because the application represented that 8 to 10 unrelated persons would be living on the Property. The Board maintains that the application described the Property as being used as a group home as defined in section 337-12 of the Ordinance, which can only be authorized as a conditional use and must be approved by City Council. The Board maintains that the reference to the Fair Housing Act merely means that the City does not discriminate.

In regard to the final issue, the Board maintains that pursuant to the Ordinance, all applications for a zoning occupancy permit must be submitted to the Zoning Officer and that Cornerstone's application for an occupancy permit was no exception. Cornerstone maintains that the MPC provides that the Board has the power to review a zoning officer's failure to act, and that the City cannot alter this by failing to prescribe a specific amount of time for a zoning officer to act.

In its supplemental brief, the Board maintains that there is nothing in the MPC or the Ordinance that requires the Zoning Officer to respond to an application for an occupancy permit within any prescribed time period. The Board maintains that these applications require many levels of review, and no action was triggered by any force

14

of law prior to Cornerstone's appeal from the Zoning Officer's inaction. Furthermore, the Board argues that section 909.1(a)(3) of the MPC requires a determination from the Zoning Officer, and that because no determination was made in this case, the appeal was premature. Like the City, the Board maintains that Cornerstone has failed to exhaust its administrative remedies, and as such, we do not have the jurisdiction to review the substantive issues raised in the instant matter.

## A. Whether Cornerstone's Appeal to the Board was Premature

We must first answer the final question raised on appeal, as it may be dispositive. The facts with regard to this issue are uncomplicated. On December 14, 2017, Cornerstone filed an application with the City's Zoning Officer seeking an occupancy permit for a single-family dwelling on the Property. On January 17, 2018, 34 days later, Cornerstone appealed to the Board alleging that the Zoning Officer's failure to respond constituted a failure to act.

As explained, Cornerstone applied for an *occupancy* permit which is distinguishable from a *zoning* permit under the Ordinance. The Ordinance defines a "Zoning Occupancy Permit" as

> [a] document issued by the [Z]oning [O]fficer upon completion of the construction of a structure or change in use of a structure or parcel of land or change in occupancy of a structure and indicating that the use and structure is in compliance with the ordinances of the City having jurisdiction over the location of such use or structure, that all conditions attached to the granting of the zoning certificate have been met and that the structure and land may be occupied and used for the purposes set forth in the zoning permit.

(Ordinance, §337-12; R.R. at 51a.) A "Zoning Permit," by contrast, is defined as "a document issued by the Zoning Officer stating that a proposed use or development will

15

be in compliance with this chapter and authorizing the applicant to proceed to obtain all required **building permits**." (Ordinance, §337-12; R.R. at 52a.) (emphasis added). Thus, the basic distinction is that an occupancy permit concerns the occupation of property, and a zoning permit is concerned with construction.

The Ordinance explains, in relevant part, that the Zoning Officer "shall" "review all applications for zoning permits and zoning occupancy permits, and issue permits when there is compliance with the provisions of this chapter." (Ordinance, §337-39(B); R.R. at 98a.) Although section 337-40(G) of the Ordinance, pertaining to zoning permits, requires that, "[w]ithin 60 days after the receipt of an application, the [Z]oning [O]fficer shall either approve or disapprove the application or submit the application to the appropriate review agencies . . . ," section 337-41 of the Ordinance, which sets forth the rules with regard to occupancy permits, contains no similar time restriction, but states that, "[p]rior to occupancy of land or structure or to the change of tenants, ownership or occupants of any structure, land[,] or premises or any portion thereof, a zoning occupancy permit shall be obtained stating that the premises is in full compliance with this chapter." (*Id*.; R.R. at 100a, 101a.) The Ordinance does not appear to otherwise require the Zoning Officer to act on occupancy permits within a specified time period. However, the Ordinance states that the Board "shall have exclusive jurisdiction to hear and render final adjudications in the following matters[,] including "appeals from the determination of the Zoning Officer, including but not limited to, the granting or denial of any permit, or **failure to act on the application therefor** . . . ." (Ordinance, §337-49(A)(2); R.R. at 114a) (emphasis added).

Thus, it is apparent that the Ordinance does not provide a specific time period for the Zoning Officer to act on applications for an occupancy permit, but allows an applicant to appeal to the Board for the Zoning Officer's failure to act. Section

16

909.1(a)(3) of the MPC contains similar language, stating that a "zoning hearing board shall have exclusive jurisdiction to hear and render final adjudications in the following matters[,] including [a]ppeals from the determination of the Zoning Officer, including, but not limited to, the granting or denial of any permit or failure to act on the application therefor. . . ." 53 P.S. §10909.1(a)(3).[11]  Notably, neither the Ordinance nor the MPC define what constitutes a "failure to act."  *See* Ordinance, §§337-49(A)(2), 337-39; 53 P.S. §10909.1(a)(3).  Furthermore, neither party has brought to this Court's attention any authority, nor does it appear from our research, that a "failure to act" has been defined by the MPC or another court interpreting section 909.1(a)(3).

First, we note that had the legislative body responsible for the Ordinance wanted to prescribe a time period for the Zoning Officer to act on an occupancy permit, it would have.  Significantly, section 337-40(G) of the Ordinance, pertaining to zoning permits, requires that "[w]ithin 60 days after the receipt of an application, the [Z]oning

---

[11] We briefly note the history of section 909.1 of the MPC.  The predecessor provision to section 909.1 of the MPC was section 909 of the MPC, Act of July 31, 1968, P.L. 805, *formerly* 53 P.S. §10909, which was enacted in 1968.  Section 909 provided that

> [t]he [zoning] board shall hear and decide appeals where it is alleged by the appellant that the zoning officer has failed to follow prescribed procedures or has misinterpreted or misapplied any provision of the action of the zoning officer. Nothing contained herein shall be construed to deny to the appellant the right to proceed directly in court, where appropriate, pursuant to Pa.R.C.P., [Nos.] 1091 to 1098 relating to mandamus.

*Scholl v. Britten*, 487 A.2d 56, 57 (Pa. Cmwlth. 1985) (quoting *former* 53 P.S. §10909).  Accordingly, it appears that section 909's power to compel a zoning officer to act had lain in mandamus.  However, Purdon's Historical and Statutory Notes indicate that this provision was repealed by the Act of December 21, 1988, P.L. 1329, and section 909.1 of the MPC was enacted in its place.  Significantly, section 909.1 of the MPC differs greatly from former section 909, and specifically grants an applicant the power to appeal from a zoning officer's failure to act.

17

[O]fficer shall either approve or disapprove the application or submit the application to the appropriate review agencies." (Ordinance, §337-40(G), R.R. at 100a.) As explained, no such limitation exists for occupancy permits. "[W]here a section of a statute contains a given provision, the omission of such a provision from a similar section is significant to show a different legislative intent." *Fonner v. Shandon, Inc.*, 724 A.2d 903, 907 (Pa. 1999) (citing *Commonwealth v. Bigelow*, 399 A.2d 392, 395 (Pa. 1979)). Accordingly, our interpretation is that the legislative body responsible for the Ordinance intentionally omitted a time period requiring a Zoning Officer to respond to an application for an occupancy permit, presumably with the knowledge that Cornerstone, or any other applicant, could appeal to the Board for a failure to act on an application.

Where a zoning ordinance does not define a term, "it must be given its usual and ordinary meaning; if a court needs to define a term in a zoning ordinance, it may consult the definitions found in statutes, regulations, or dictionaries for guidance." *Nether Providence Township v. R.L. Fatscher Associates, Inc.*, 674 A.2d 749, 750-51 (Pa. Cmwlth. 1996). In reviewing the plain language of the text of an ordinance, *Kohl v. New Sewickley Township Zoning Hearing Board*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015), we are "guided to construe words and phrases in a sensible manner, utilize the rules of grammar and apply their common and approved usage, and give undefined terms their plain, ordinary meaning." *Adams Outdoor Advertising, LP v. Zoning Hearing Board of Smithfield Township*, 909 A.2d 469, 483 (Pa. Cmwlth. 2006). In interpreting a zoning ordinance, we apply the rules of statutory construction. *Delchester Developers, L.P. v. Zoning Hearing Board of Township of London Grove*, 161 A.3d 1081, 1103 (Pa. Cmwlth. 2017) (citing *Borough of Fleetwood v. Zoning Hearing Board of Borough of Fleetwood*, 649 A.2d 651, 656 (Pa. 1994)). The primary

18

mission of statutory interpretation is to determine legislative intent.  1 Pa.C.S. §1921. The plain language of a statute generally provides the best indication of legislative intent, and therefore, statutory construction begins with analyzing the text itself.  *Kohl*, 108 A.3d at 968 (citing *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board*, 918 A.2d 171, 176 (Pa. Cmwlth. 2007) (en banc), *aff'd*, 974 A.2d 1144 (Pa. 2009)).  To ascertain and provide a natural construction of language and phrases, we may consult dictionaries and can draw upon common sense and basic human experience.  *Kohl*, 108 A.3d at 969.[12]  "In situations where the language of the statute, ordinance, or regulation is ambiguous, the additional factors enumerated in section 1921(c) of the Statutory Construction Act, 1 Pa.C.S. §1921(c)[,] may be employed to ascertain the meaning of its provisions."[13]  *S & H Transport, Inc. v. City of York*, 210 A.3d 1028, 1038 (Pa. 2019).  "Where a term in a zoning ordinance is ambiguous or undefined, we must construe the term broadly to allow the landowner the least restrictive use of his property."  *Nether Providence Township*, 674 A.2d at

---

[12] In conducting this analysis, this Court is mindful "that the setting in which language is used informs our understanding of the particular language employed," *Kohl*, 108 A.3d at 969, and "that the meaning of words may be indicated or controlled by those words with which they are associated." *Commonwealth ex rel. Fisher v. Philip Morris, Inc.*, 4 A.3d 749, 756 n.9 (Pa. Cmwlth. 2010).

[13] Section 1921(c) provides that "when the words of the statute are not explicit, the intention of the [legislative body] may be ascertained by considering, among other matters," the following:

> (1) The occasion and necessity for the statute.
> (2) The circumstances under which it was enacted.
> (3) The mischief to be remedied.
> (4) The object to be attained.
> (5) The former law, if any, including other statutes upon the same or similar subjects.
> (6) The consequences of a particular interpretation.
> (7) The contemporaneous legislative history.
> (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. §1921(c).

750-51 (citing *Neill v. Bedminster Township Zoning Hearing Board*, 592 A.2d 1385 (Pa. Cmwlth. 1991)). "An ambiguity exists when language is subject to two or more reasonable interpretations . . . ." *Adams Outdoor*, 909 A.2d at 483 (citations omitted).

We conclude that based upon the facts and circumstances before this Court, the Zoning Officer failed to act, and therefore, Cornerstone's appeal to the Board was not premature. The term "failure," in the relevant context, is defined by Black's Law Dictionary as "1. Deficiency; lack; want. 2. An omission of an expected action, occurrence, or performance." Black's Law Dictionary (11th ed. 2019). Based upon the facts before us, Cornerstone could have reasonably expected the Zoning Officer to respond to its application within 34 days. First, we note that Cornerstone filed its first application on November 9, 2017. Although it does not appear in the record, in *Cornerstone Residence, Inc. v. City of Clairton, Pennsylvania* (W.D. Pa., No. CV 17-706, filed Jan. 5, 2018), 2018 WL 306670, at *2, the District Court pointed out that the Zoning Officer responded to the November 9, 2017 application on December 6, 2017, 27 days after the application was filed. Eight days following this denial, Cornerstone resubmitted its application on December 14, 2017. However, 34 days passed without any response from the Zoning Officer. In the absence of a prescribed time period, it was reasonable for Cornerstone to expect that the Zoning Officer would respond within a similar time, not a week longer than he originally took to respond.[14]

---

[14] In support of its argument, Cornerstone points out that it filed three applications for an occupancy permit, and suggests that a failure to act occurred when the Zoning Officer did not respond to the third application. We note that the record evidence only indicates that Cornerstone applied for an occupancy permit two times. Cornerstone's application indicates that it was first filed on November 9, 2017. (R.R. at 15a.) However, the record demonstrates that Cornerstone had to resubmit the November 9, 2017 application again on December 14, 2017, because the November 9, 2017 application was found to have contained insufficient information. (R.R. at 14a, 15a.) The record contains no other evidence that another application was filed. However, the record contains the City's proposed findings of fact and conclusions of law that it submitted to the trial court indicating that

**(Footnote continued on next page…)**

20

Furthermore, we note that the idea of preventing unreasonable delay is not unknown to the MPC. By way of example, the MPC permits landowners to obtain

Cornerstone submitted its first occupancy permit application on April 20, 2017, which became the subject of a federal lawsuit.

In the federal lawsuit, *Cornerstone Residence, Inc. v. City of Clairton, Pennsylvania* (W.D. Pa., No. CV 17-706, filed Nov. 8, 2017), 2017 WL 5171189, at *2, *3, Cornerstone submitted an application for an occupancy permit, which was nearly identical to the application issued here. The Zoning Officer responded to Cornerstone explaining that its application was "not a permitted use in that zoning district, [and that the City] was in the process of responding to the application." *Id*. at *3. Cornerstone responded and requested an inspection, which the Zoning Officer denied. *Id*. The application was denied while under review by a building code official as the Property was not in conformance with the requirements of the Pennsylvania Uniform Construction Code. *Id*. Following this denial, Cornerstone took no further action with respect to the application, and did not appeal it to the Board. *Id*. However, the crux of Cornerstone's allegations in that case dealt with its claim that the defendants engaged in intentional discrimination in violation of the Fair Housing Act. *Id*. at *9. Pertinently, the defendants moved to dismiss Cornerstone's claim for injunctive relief asking the court to direct the Zoning Officer to issue an occupancy permit, due to the fact that it was not ripe for adjudication because Cornerstone failed to appeal the Zoning Officer's denial to the Board. *Id*. The District Court agreed and dismissed the claim accordingly. *Id*. at *11. The Court also concluded that Cornerstone failed to state plausible claims for disparate treatment and dismissed its request for a preliminary injunction. *Id*. at *14. The District Court issued this decision on November 8, 2017. It appears that the day after the District Court issued this decision, Cornerstone filed its November 9, 2017 application. However, as explained above, the record only demonstrates that two applications were ever filed, the first on November 9, 2017, and the second on December 14, 2017, due to the inadequacy of the first.

Cornerstone filed for reconsideration, which the District Court denied. *Cornerstone Residence, Inc. v. City of Clairton, Pennsylvania* (W.D. Pa., No. CV 17-706, filed Jan. 5, 2018), 2018 WL 306670, at *1. There, Cornerstone argued that the District Court should grant it leave to amend its claim to allege that it would be futile to pursue an appeal to the Board. *Id*. at *1. The District Court pointed out that the Zoning Officer responded to the November 9, 2017 application on December 6, 2017, and denied the application "due to insufficient information." *Id*. at *2. In its motion for reconsideration, Cornerstone alleged that the City engaged in a "'pattern of obstruction' . . . to prevent it from obtaining zoning approval." *Id*. However, the District Court denied Cornerstone's motion for reconsideration. *Id*. at *3, *5. Cornerstone appealed to the United States Court of Appeals for the Third Circuit, which affirmed the District Court. *See Cornerstone Residence, Inc. v. City of Clairton, Pennsylvania*, 754 F. App'x 89 (3d Cir. 2018) (unpublished).

21

preliminary opinions as to avoid "unreasonable delay." *See* 53 P.S. §10916.2.[15]  In the

context of a deemed approval, we have explained:

> The Pennsylvania Supreme Court, recognizing that
> initiative, consideration, and decision are commonly
> controlled by procrastination rather than celerity, stated as
> follows with regard to the purpose of Section 908(9):
>
>> The Legislature recognized the existence of this
>> inertia in the orderly disposition of pending
>> governmental matters, and, accordingly, wisely
>> provided that when a board of adjustment
>> indolently allows 45 days to go by without a
>> decision following a hearing, the complaining
>> party shall have the benefit of that slothful
>> inattention and gain the requested permit.
>> Without this kind of coercive determination, a
>> board could effectively prevent the erection of
>> needed structures through the simple process of
>> luxurious lolling while spiders of inattention
>> spin webs of indifference over pending public
>> problems.
>
> [*Humble Oil and Refining Co. v. East Lansdowne Borough*,
>  227 A.2d 664, 666 (Pa. 1967)].
>
> Because *Humble Oil* was decided before the MPC required a
> hearing within sixty days that decision addressed only the
> requirement that the board reach a decision within forty-five
> days of the last zoning board hearing. *Penn Advertising, Inc.
> v. Kring, . . .* 565 A.2d 1238 ([Pa. Cmwlth.] 1989).  However,
> the intent of the legislature, as elucidated in *Humble Oil,*
> remains the same for the entire section as it stands today. *Id.*

*Grim v. Borough of Boyertown*, 595 A.2d 775, 779 (Pa. Cmwlth. 1991).  The provision

in section 909.1(a)(3), allowing for an appeal to the Board due to a zoning officer's

---

[15] Section 916.2 of the MPC, added by the Act of December 21, 1988, P.L. 1329.

failure to act, is fairly characterized as a mechanism to avoid unnecessary and/or unreasonable delay.[16]

We pause here to address the City's argument in its supplemental brief that, before an occupancy permit can be obtained through the Ordinance, a "layered review" must be conducted by the Zoning Officer and a building code official. Specifically, the City posits that, prior to obtaining an occupancy permit, a certificate of occupancy must be first obtained through the Uniform Construction Code and that the Zoning Officer's approval is dependent on the building code officer's approval. The City argues that there is no evidence in the record indicating that a certificate of occupancy was received, and thus, the Zoning officer was not obliged to approve Cornerstone's application. However, the City failed to raise this argument below. "[Arguments] not raised in the lower court cannot be raised for the first time on appeal." *Lamar Advertising Co. v. Zoning Hearing Board of Municipality of Monroeville*, 939

---

[16] Although not binding on this Court, the Middle District of Pennsylvania's decision in *Halchak v. Dorrance Township Board of Supervisors* (M.D. Pa., No. 3:18-CV-1285, filed Sept. 30, 2019), 2019 WL 4795650, at *8, is illustrative. In that case, the Middle District reviewed due process claims brought by a landowner. *Id*. at *1. Factually, the landowner sought an occupancy permit to operate a used car business, and the occupancy permit was never granted or denied. *Id*. Specifically, the occupancy permit was sought under the Uniform Construction Code. The question before the court was whether the landowner's rights were violated because the state procedures at issue did not satisfy procedural due process requirements. *Id*. at *2. There, the court stated that the effect of withholding a decision on the occupancy permit is "legally significant . . . because, without the municipal authority's definitive position on whether an application is granted or denied, consideration of an aggrieved applicant's claim may ultimately be hindered or foreclosed." *Id*. at *5. The Middle District concluded that the relevant provisions in the Uniform Construction Code "do not contemplate review of a building code official's failure to act. They do not . . . provide a 'means of contesting a decision to withhold an occupancy permit.'" *Id*. at *7 (citations omitted). Thus, the court determined that the landowner's due process rights were violated. Significantly, the court stated that in contrast to the Uniform Construction Code, "in the Pennsylvania scheme for zoning matters, the zoning hearing board is given jurisdiction to hear and render final adjudications in matters which include [a zoning officer's] *failure to act on*" an application for any permit. *Id*. (emphasis in original) (quoting 53 P.S. §10909.1(a)(3)).

23

A.2d 994, 1001 (Pa. Cmwlth. 2007). *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Additionally, we also address the Board's argument that the appeal is premature because the Zoning Officer did not make any "determination," there was nothing to appeal, and therefore, the Board did not have jurisdiction. However, if we accepted this as true, then the language in section 909.1(a)(3) allowing for an appeal for a failure to act would be reduced to mere surplusage. "The courts must construe every statute, if possible, to give effect to all of its provisions so that none are rendered mere surplusage." *White v. Associates in Counseling & Child Guidance, Inc.*, 767 A.2d 638, 642 (Pa. Cmwlth. 2001) (citing 1 Pa.C.S. §§1921(a) and 1922(a)). In other words, if we accepted as true that only a determination was appealable, then the language allowing an appeal to the Board due to a failure to act, would be empty surplusage.

Accordingly, based on these facts, Cornerstone's appeal to the Board from the Zoning Officer was not premature and was reasonable under the circumstances. By reaching this conclusion, we now consider whether the trial court conducted a *de novo* review on remand.

## B. Whether the Trial Court Conducted a *De Novo* Review on Remand

On remand, the trial court was unequivocally instructed to conduct a *de novo* review and issue its own findings of fact and conclusions of law. In *City of Clairton I*, this Court explained that after a party appeals a deemed zoning application approval, the reviewing court must apply a *de novo* standard of review, *i.e.*, determine the merits of the application and issue its own findings of fact and conclusions of law. Slip op. at 6 (citing *Gryshuk v. Kolb*, 685 A.2d 629, 634 (Pa. Cmwlth. 1996)). We have explained that "[d]e novo review is full consideration of a case at another time." *Passel*

*v. Department of Transportation, Bureau of Driver Licensing*, 928 A.2d 381, 383 (Pa. Cmwlth. 2007) (citing *Civitello v. Department of Transportation, Bureau of Traffic Safety*, 315 A.2d 666 (Pa. Cmwlth. 1974)).[17]

The City's contention that the trial court used language that was indicative of appellate review is unavailing. A plain reading of the trial court's decision reveals that findings of fact and conclusions of law were issued, and it concluded that "the proposed use fits the definition of a single-family use." (Trial court. op. at 3.) The City takes issue with the fact that the trial court used the language "affirmed;" however, the mere usage of this word does not convert the trial court's analysis from *de novo*

---

[17] In a different context, we have explained that

> [t]he difference between *de novo* review and appellate review is significant. Under *de novo* review, the reviewing tribunal conducts an independent fact-finding proceeding in which new evidence is taken and all issues are determined anew. Under appellate review, the reviewing tribunal examines the record to determine whether the agency's findings are reasonably supported by substantial evidence.

*Medical Shoppe, Ltd. v. Wayne Memorial Hospital*, 866 A.2d 455, 464 (Pa. Cmwlth. 2005) (quoting *Manor v. Department of Public Welfare*, 796 A.2d 1020, 1029 n.12 (Pa. Cmwlth. 2002)). "The reviewing tribunal redecides the case, substituting its judgment for that of the initial tribunal." *Medical Shoppe Ltd.*, 866 A.2d at 464 (citing *D'Arciprete v. D'Arciprete*, 470 A.2d 995, 996 (Pa. Super. 1984)).

We also explained that no single procedure constitutes *de novo* review and that

> [p]ursuant to particular statutes, procedures run the gamut from excluding all previous testimony to permitting the adjudicator, in his or her discretion, to receive no additional testimony. The *sine qua non* of *de novo* review is not that the person or body conducting the review hears testimony anew; rather it is that such person or body possess and exercise the authority to arrive at an independent judgment on the matter in dispute.

*Medical Shoppe Ltd.*, 866 A.2d at 464 (citing *Codorus Stone & Supply Co., Inc. v. Kingston*, 711 A.2d 563, 566 (Pa. Cmwlth. 1998)).

25

review to appellate review as the City suggests. The nature of the trial court's decision was to reconsider the case anew, and to issue its own findings of fact and conclusions of law. The City's contention that the trial court failed to cite any law articulating the *de novo* standard of review is equally unavailing. As we explained, a plain reading of the trial court's opinion indicates that it considered the case anew. Similarly, and contrary to the Board's contention, the trial court did not simply conclude that the application was deemed approved, but it specifically explained that the proposed use fit the definition of a single-family dwelling. Moreover, the trial court recognized, in the first sentence of its opinion, that it was required to make findings of fact and conclusions of law because of the deemed approval. (Trial court op. at 1.) *See Nextel Partners, Inc.*, 958 A.2d at 596 (reiterating, in the context of whether a deemed approval did occur, that "when a deemed approval occurs, a board's findings are nullified and the trial court is required to make its own findings").

The City's final argument, *i.e.*, that the trial court could not have conducted *de novo* review because there is no record of proceedings below and the only evidence at issue was Cornerstone's application and its notice of appeal letter to the Board is also unavailing. In its brief, the City recognizes that "the parties agreed [that] additional evidence was not necessary to resolve this matter. [(]R.R. at 199a[,)] (Cornerstone's Proposed Findings and Conclusions). It is true that there was such an agreement. . . ."[18] (City's Br. at 14 n.8.) Despite whether new evidence was received,

---

[18] The City qualifies this position by explaining:

> [I]t is not true that the agreement was an acknowledgement that Cornerstone could succeed on just these two documents alone. To the contrary, the City . . . understood that Cornerstone had the burden to show compliance with the Zoning Ordinance. *See* R.R. at 51a, 98a, 101a (Zoning Ordinance §337-39; §337-41; §337-12). The City of

**(Footnote continued on next page…)**

26

as explained above, the crux of *de novo* review is the full consideration of a case at another time, not the presentation of new evidence.

## C. Cornerstone's Proposed Use of the Property as a Single-Family Dwelling

Having concluded that the trial court correctly employed a *de novo* standard of review, we now turn to the merits of Cornerstone's application. Before we conduct our review, we pause to address the contention that Cornerstone's application should be read as seeking to use the Property as a group home instead of seeking to use it as a single-family dwelling. The application in question specifically identifies the "proposed use" being sought as a "single[-]family dwelling." (R.R. at 15a.) The confusion arises in Cornerstone's notice of appeal to the Board, in which it stated:

> As noted in the occupancy permit application, the residents who will occupy the [Property] are predominantly under 62 years old and do not require the additional fire protection requirements imposed by the [Ordinance's] "group home" definition incorporation of [Chapt.] 263. Over and above this, the "group home" definition additionally provides that "Group Homes shall be subject to the same limitations and regulations by the City as the type of dwelling unit they occupy." As such, even if the use applied for was included in the definition of group home, the limitations and regulations applicable to a single[-]family dwelling, including occupancy by persons with disabilities as defined in the Fair [Housing] Act as a single family and allowance of this use as a permitted use in an R-2 zoning district, would apply.

Clairton believed that Cornerstone could not succeed on the two documents alone, and did not object if Cornerstone offered nothing further. To be clear, the agreement did not in any way relieve the trial court from performing its function.

(City's Br. at 14 n.8.)

27

(R.R. at 19a.) As we explained in *City of Clairton I*, this is merely an alternative suggestion by Cornerstone and does not transform its application to seeking to use the Property as a group home and not as a single-family dwelling. *See Appeal of Lynch Community Homes, Inc.*, 554 A.2d 155, 157 (Pa. Cmwlth. 1989) (refusing to apply the ordinance's definition of family because appellant requested a special exemption under the ordinance's definition of group home instead). Furthermore, it appears that the proposed use would not meet the definition of a group home. A group home is defined, in part, as

> a dwelling unit operated by a responsible individual, family[,] or organization with a program to provide a supporting living arrangement for individuals where *special care* is needed by the persons served due to age, emotional, mental, developmental[,] or physical disability. This definition shall expressly include facilities for the supervised care of persons with disabilities subject to protection under the Federal Fair Housing Act. . . .

(Ordinance, §337-12; R.R. at 41a) (emphasis added). Significantly, there has been no allegation that Cornerstone intends to offer "special care." Accordingly, we need not address this issue further.

### 1. The Ordinance's Definition of Family and the Fair Housing Act

An "R-2 Medium Density Residential District" is defined under section 337-14 of the Ordinance. (R.R. at 52a.) Section 337-18 (Table 1) of the Ordinance indicates that a single-family detached dwelling is a permitted use[19] in an R-2 District. (R.R. at 140a.) A "single-family detached dwelling" is defined as "a building occupied by only one dwelling unit, and having no party wall in common with an adjacent

---

[19] "A permitted use refers to a use which is allowed absolutely and unconditionally." *Aldridge v. Jackson Township*, 983 A.2d 247, 257 n.8 (Pa. Cmwlth. 2009) (citations omitted).

building." (Ordinance, §337-12; R.R. at 38a.) A "dwelling" is generally defined as "a building or portion thereof, which is designed for or occupied in whole or in part for residential use having one or more dwelling units, but not including motels, boardinghouses, assisted-living facilities, continuing-care facilities, personal care homes, or skilled nursing homes." *Id*. "Family" is defined as

> [o]ne or more individuals who are 'related' to each other by blood, marriage[,] or adoption including persons receiving formal foster care) or up to five unrelated individuals who maintain a common household with common cooking facilities and certain rooms in common, and who live within one dwelling unit. The foregoing restrictions do not apply to persons with disabilities as defined in the Fair Housing Act, 42 U.S.C. [§§3061-3631].

Ordinance, §337-12; R.R. at 40a.)

Of significant importance is the portion of the definition which states that "[t]he foregoing restrictions do not apply to persons with disabilities as defined in the Fair Housing Act." *Id*. The Board maintains that this only specifies that the City must not discriminate. However, the plain language of the Ordinance is unmistakable. The aforementioned restrictions in the definition of "family" **do not** apply to those who are defined as disabled under the Fair Housing Act. As explained above, in reviewing the plain language of the text of an ordinance, *Kohl*, 108 A.3d at 968, we are "guided to construe words and phrases in a sensible manner, utilize the rules of grammar and apply their common and approved usage, and give undefined terms their plain, ordinary meaning." *Adams Outdoor*, 909 A.2d at 483. When interpreting a zoning ordinance, we apply the rules of statutory construction, with the primary mission of determining legislative intent, which is best indicated by the plain language of the statute. *See Delchester Developers*, 161 A.3d at 1103; *Kohl*, 108 A.3d at 968; 1 Pa.C.S. §1921. We

recognize that "[a board's] interpretation of its own zoning ordinance is entitled to great deference and weight." *Hafner v. Zoning Hearing Board of Allen Township*, 974 A.2d 1204, 1210 (Pa. Cmwlth. 2009). As a general matter, the courts afford the interpretation proffered by a zoning hearing board and/or a zoning officer some degree of deference. *See Kohl*, 108 A.3d at 968-69. However, if that interpretation is inconsistent with the plain language of the ordinance, the "interpretation carries little or no weight." *Malt Beverages Distributors*, 918 A.2d at 176. This is because "a zoning board is not a legislative body, and it lacks authority to modify or amend the terms of a zoning ordinance." *Greth Development Group, Inc. v. Zoning Hearing Board of Lower Heidelberg Township*, 918 A.2d 181, 187 (Pa. Cmwlth. 2006). Despite the contention of the Board, we cannot ignore the clear and unambiguous language in the Ordinance that states that the restrictions in the definition of family do not apply to those who are defined as disabled under the Fair Housing Act.

The Fair Housing Act defines "handicap" as a person who has "a mental or physical impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. §3602(h)(1); *Evans v. Zoning Hearing Board of Borough of Spring City*, 732 A.2d 686, 692 n.6 (Pa. Cmwlth. 1999). Neither party seems to dispute that recovering addicts are considered to be handicapped under the Fair Housing Act. With regard to the same Property at issue, the Third Circuit Court of Appeals has concluded that

> [t]he [Fair Housing Act] defines handicap as "a physical or mental impairment which substantially limits one or more of such person's major life activities . . . but such term does not include current, illegal use of or addiction to a controlled substance." 42 U.S.C. §3602(h). The [Fair Housing Act], therefore, provides that current addicts are not a protected group. However, we have held, consistent with other courts,

30

> that recovering addicts are. *See Lakeside Resort Enterprises, LP v. [Board of Supervisors] of Palmyra [Township]*, 455 F.3d 154, 156 n.5 (3d Cir. 2006) ("We note that at least two other courts have held that recovering alcoholics and drug addicts are handicapped, so long as they are not currently using illegal drugs.").

*Cornerstone Residence, Inc.*, 754 F. App'x at 91. Relying on *Lake Side Resort Enterprises, LP*, 455 F.3d at 156 n.5, this Court in *Bernstein v. City of Pittsburgh Zoning Board of Adjustment* (Pa. Cmwlth., No. 1565 C.D. 2010, filed May 5, 2011) (unreported),[20] contemplated the same. Here, it seems that the individuals which will be residing on the Property are handicapped as defined by the Fair Housing Act. Cornerstone's application explains that in order to qualify, "individuals must be in **recovery** from drug or alcohol addiction [and] must not be currently using drugs or alcohol. . . ." (R.R. at 16a) (emphasis added). The determination of whether an individual meets this criterion is to be made by a licensed professional. *Id*. Moreover, Cornerstone's application indicates that its role is to ensure all residents are in recovery and are meeting residence standards. *Id*. Because the Ordinance very clearly states that the restrictions in the definition of family will not apply to those who are disabled/handicapped under the Fair Housing Act, the restriction against five unrelated persons living together does not apply.[21]

---

[20] *Bernstein* is an unreported opinion. Under section 414(a) of this Court's Internal Operating Procedures, an unreported opinion may be cited for its persuasive value. 210 Pa. Code §69.414(a).

[21] It appears that the City concedes this point in its reply brief. "Specifically, under the [Ordinance], if Cornerstone's proposed residents are considered legally disabled under the [Fair Housing Act], then Cornerstone may house more than 5 unrelated residents in a single-family dwelling." (Cornerstone's Reply Br. at 3-4.) However, the City maintains that Cornerstone has failed to adduce evidence to support this conclusion.

## 2. Whether the Proposed Use Constitutes a Single-Family Dwelling

Next, the City argues that the proposed use does not otherwise qualify as a single-family dwelling because Cornerstone wants to "operate" a "sober living residence for men recovering from addiction," the residence will include eight to ten "disabled residents," "[o]versight" will be provided by a house manager, residents will be charged "expenses as necessary," and residency is to be for "a substantial period or permanent." (City's Br. at 17 (citing R.R. at 14a-16a).) Essentially, the City contends that these characteristics are not harmonious with a single-family use. Cornerstone responds that these characteristics do not preclude the proposed use from meeting the definition of a single-family dwelling and that our jurisprudence has held them to be consistent with the definition of family.

In *Slice of Life, LLC v. Hamilton Township Zoning Hearing Board*, our Supreme Court reaffirmed its holding that "uses not expressly permitted in a zoning ordinance 'are excluded by implication.'" 207 A.3d 886, 902 (Pa. 2019) (quoting *Silver v. Zoning Board of Adjustment*, 112 A.2d 84, 87 (Pa. 1955)). *Slice of Life* addressed whether a zoning ordinance's definition of family permitted a "purely transient use of property located in a residential zoning district." 207 A.3d at 888. The Court concluded that, pursuant to its decisions in *Albert v. Zoning Hearing Board of North Abington Township*, 854 A.2d 401 (Pa. 2004), and *In re Appeal of Miller*, 515 A.2d 904 (Pa. 1986), a *purely transient* use of a house is not a permitted use in a residential zoning district limited to single-family homes. *Slice of Life*, 207 A.3d at 888. The Court explained that under *Miller*, the focus is properly "on whether the unit functions as a family unit, rather than on respective relationships that existed between the members of the unit." *Slice of Life*, 207 A.3d at 890 (quoting *Miller*, 515 A.2d at 907). Our Supreme Court also stated that under *Miller*, courts should employ a

32

"'functional analysis' to determine whether the use was that of a family." *Slice of Life*, 207 A.3d at 890 (quoting *Miller*, 515 A.2d at 907-08.) The Court further explained that in terms of transience, under *Albert*, "a group of individuals in a single household must not only function as a family within that household, but in addition, the composition of the group must be **sufficiently stable and permanent so as not to be fairly characterized as purely transient**." *Slice of Life*, 207 A.3d at 891 (emphasis in original) (quoting *Albert*, 515 A.2d at 410).

*Miller* is also instructive here. The property at issue in *Miller* was zoned in a residential district, and the house thereon had one kitchen, six bedrooms, two bathrooms, and a recreation room. 515 A.2d at 905. Under the local ordinance, a single-family dwelling was a permitted use in the residential district where the property was located. *Id.* The property owner sought to house individuals as boarders who were physically or mentally handicapped. *Id.* Eventually, the property housed seven individuals, who in return for a fee of around $200.00 a month, were provided with a room, board, some transportation, supervision in grooming, and monitoring of personal needs. *Id.* The residence also housed a caretaker, who in return for room and board, assisted in the care of the residents. *Id.* None of the residents were related. *Id.* However, the residents would share the furnishings throughout the house and each occupant would have access to all areas of the property. *Id.* at 908. The ordinance defined family as "any number of persons living and cooking together as a single housekeeping unit." *Id.* at 905 (emphasis omitted).

Our Supreme Court concluded that the residents paying $200.00 a month did not suggest a profit motive. *Id.* at 908. The Court explained that in family units adult members frequently contribute, and the "mere fact that a [resident] pays a fee for belonging to the unit does not transform the relationship unless it also appears that the

profit motive is the basis for the relationship." *Id*. at 908-09. The Court also determined that the establishment was not a transient one, and that residents remain for substantial periods of time. *Id*. As such, the Court upheld the use of the property as described.

The Court's decision in *Albert* is also instructive. In *Albert*, the property owner filed a zoning application to operate a halfway house in a residentially-zoned district. 854 A.2d at 402. The property owner sought to establish a "sober family-type residential environment for females . . . who had completed in-patient rehabilitation programs" for drug or alcohol abuse at other facilities. *Id*. The property was to accommodate between 6 and 15 women, and the length of their stay would not be limited, provided that the rules were followed. *Id*. However, the evidence showed that the average stay was for a period between two to six months. *Id*. Moreover, the facility would not provide treatment, but a supervisor would be present and would act as the head of house, "much the same way as a parent does in a family with children." *Id*. at 403. Meals were to be served "family style" and would be prepared by the members of the group. *Id*. Residents would maintain the common areas in the residence, but would be responsible to take care of their personal living space. *Id*. The residents were to pay around $100.00 per day for the services, but the project was not intended to be a "profit-making enterprise." *Id*. The ordinance did not define "family." *Id*.

In *Albert*, the Court rejected the argument that there was a profit-driven motive as a basis for the relationship because the purpose of the project was not a profit-making enterprise, and that if excess profits were earned, they were to be donated. *Id*. at 408. However, the Court explained that the transient nature of the residents was unlike members of a traditional family. *Id*. at 409. It explained that "it is undeniable that inherent in the concept of 'family' . . . is a 'certain expectation of relative stability

34

and permanence in the composition of the familial unit.'" *Id*. Specifically, the Court concluded that "the composition of the group must be sufficiently stable and permanent so as to not be fairly characterized as purely transient." *Id*. at 410. In applying that standard, the Court concluded that the residents will change on a "fairly regular basis," and that the purpose of the residence was to house residents only as long as necessary to return them to their own families. *Id*. Our Supreme Court pointed out that the average stay was expected to be two to six months, and accordingly, the residents could turn over up to six times per year. *Id*. The Court concluded that that "level of instability and transience is incompatible with the single-family concept." *Id*.

This Court's decision in *Hartman v. Zoning Hearing Board of Cumru Township*, 133 A.3d 806, 807 (Pa. Cmwlth. 2016), is also instructive.[22] There, the

---

[22] The Supreme Court in *Slice of Life* discussed the term "single housekeeping unit" at length. The term is not used in the definition of "family" at issue in this case. However, many cases that the Supreme Court interpreted in *Slice of Life*, including *Albert* and *Miller*, interpreted the term and those cases are relevant to our disposition herein. The Supreme Court explained that a "'[s]ingle housekeeping unit' is a phrase that is commonly used in the definition of 'family' in zoning ordinances throughout the country." *Slice of Life*, 207 A.3d at 889. The Court explained that the phrase

> finds its roots in the beginnings of zoning once "the legitimacy of exclusive single-family districts was settled." Early zoning ordinances, however, generally failed to define the term "family," requiring the judiciary to provide its meaning. "[D]issatisfaction with reliance solely upon judicial interpretation for the definition of the term 'family' became increasingly apparent," prompting the drafters of zoning ordinances across the United States to include a definition within the ordinances themselves. Based on the use of the phrase "single housekeeping unit" by leading commentators on zoning, ordinances began to use that language to define the term "family."

*Slice of Life*, 207 A.3d at 889 (citations omitted). The Court also pointed out that "[i]n defining 'single housekeeping unit,' courts adopted a definition that required the occupants of a home to live and behave in a manner like that of a family in a character that is 'permanent . . . and not transitory.'"
**(Footnote continued on next page…)**

35

property owner filed an application seeking to construct a single-family detached dwelling in a residential district. *Id*. at 807. The purpose of the dwelling was to provide care for the terminally ill in a "family-like environment." *Id*. at 807-08. The property was to house three terminally ill residents and four volunteers that would care for them. *Id*. at 808. The house was to have three individual bedrooms, three bathrooms, a common living room, a common kitchen, and a common dining area. *Id*. The volunteers were to provide cooking, cleaning, and maintenance; however, the residents would provide their own support services like nursing or health care. *Id*. The ordinance defined "family" as

> a group of not more than four . . . persons unrelated by blood, marriage[,] or adoption, living together in a single dwelling and maintaining it as a functional common household. The term 'family' shall be deemed to include any domestic employees or gratuitous guests but shall not include any roomer, boarder, lodger[,] or persons residing in a group home.

---

*Slice of Life*, 207 A.3d at 900 (citation omitted). The Court pointed out that in *Albert*, it concluded that the phrase "single housekeeping unit" was a term of art, widely used in zoning ordinances as the "essential element" of what constituted a family for zoning purposes. *Slice of Life*, 207 A.3d at 890. The Court explained that the phrase is a term understood to require that a group of individuals in a single household must not only function as a family, but must be as stable and permanent "as not to be fairly characterized as purely transient." *Slice of Life*, 207 A.3d at 892 (citing *Albert*, 854 A.2d at 410) (emphasis omitted).

Although the phrase is not used in the definition of family as defined in the Ordinance, *Miller* and *Albert* have been applied to cases in which the definition of family at issue does not include the phrase. *See Hartman*, 133 A.3d 806. Relatedly, the definition of family in *Hartman* is similar to the definition of family relevant here. The definition of family in *Hartman* provided in relevant part, "a group of not more than four . . . persons unrelated by blood, marriage[,] or adoption, living together in a single dwelling and maintaining it as a functional common household." 133 A.3d 808-09. Similarly, the definition of family in the Ordinance provides that "[o]ne or more individuals who are 'related' to each other by blood, marriage[,] or adoption including persons receiving formal foster care) or up to five unrelated individuals who maintain a common household with common cooking facilities and certain rooms in common, and who live within one dwelling unit." (Ordinance, §337-12; R.R. at 40a.) Accordingly, we find these cases to be on point and instructive.

36

*Id.* at 808-09. Relying on *Albert*, this Court concluded that the proposed arrangement was stable and permanent because the residents were to reside at the dwelling until their death, and would not otherwise be required to leave. *Id.* at 809. We explained that the proposed dwelling would have three bedrooms, one common kitchen, a dining room, a living room, a laundry room, a foyer, an office, and a chapel; and all residents would have access to these areas. *Id.* We also pointed out that all meals would be made in the kitchen, and served to the residents who would eat them together, socialize in the living room, and partake in religious services in the chapel. *Id.* Relying on *Miller*, we concluded that the residents were to maintain the home as a functional common household. *Id.* at 809-10. Finally, we rejected the argument that the volunteers defeated the use of the property as a "family." *Id.* at 810. We concluded that the purpose of the volunteers was to create a family-like environment, and like a family, the volunteers were to provide support and care. *Id.* We concluded that the zoning hearing board did not err in concluding that the proposed use fit the definition of single-family dwelling. *Id.*

Turning to the instant case, like *Albert* and *Hartman*, the residents will have their own bedrooms, will share all other living spaces, responsibilities, and activities; and the residents are "expected to live together for a substantial period of time or even permanently." (Trial court op. at 2.) With regard to Cornerstone charging residents for expenses, like *Miller*, the fact that Cornerstone will charge a fee also does not transform its use. Cornerstone maintains that it will charge "expenses as necessary." (R.R. at 14a.) The charging of expenses as necessary alone does not indicate a profit motive, and paying a fee appears to be akin to adult family members contributing to a household.

37

With regard to the time that individuals will spend living in residence, the instant matter is distinguishable from *Albert*. Unlike *Albert*, Cornerstone explains that the residents will remain on the Property permanently or for a substantial period of time. Moreover, there is no indication that the residents will turn over on a regular basis, or that the purpose of the residents' stay on the Property is only as long as necessary to get them on their feet. Contrarily, like the residents in *Hartman* and *Miller*, Cornerstone's application indicates that the residents here will not be required to leave the premises after a certain period of time, but will be allowed to remain on the Property for a substantial period of time or permanently. With regard to "oversight," like *Albert* and *Hartman*, there is no indication in the record that the oversight provided by Cornerstone will be anything more substantial than what the head of a household provides in a traditional family, or that Cornerstone will provide anything more than support or care.

The plain text of the Ordinance supports this conclusion as well. It is clear that the definition of family contemplates unrelated individuals living together. Specifically, the definition of family states that a family can be "up to five unrelated individuals who maintain a common household. . . ." (Ordinance, §337-12; R.R. at 40a.) Moreover, the second part of the definition states that "[t]he foregoing restrictions do not apply to persons with disabilities as defined in the Fair Housing Act." *Id*. (citations omitted). Thus, it is apparent that not only does the definition of family contemplate five unrelated individuals living together, it also waives the restrictions on the individuals that are handicapped under the Fair Housing Act. Accordingly, we agree with Cornerstone that its proposed use fits the definition of a single-family dwelling and may be used as such.

**D. Whether the Findings of Fact are supported by Substantial Evidence**

Next, we examine whether the trial court's findings are supported by substantial evidence. The City argues that the record before the trial court, which contained only Cornerstone's application and notice of appeal letter, was insufficient evidence for the trial court to make the required conclusions of law in Cornerstone's favor. The City argues that conclusions and allegations in Cornerstone's application are insufficient to prove an individual is handicapped under the Fair Housing Act, and that actual evidence must be presented. Relatedly, the City takes issue with the fact that Cornerstone failed to identify any specific person with an actual disability. Furthermore, the City maintains that although Cornerstone asserts that individuals will live on the Property for a substantial period or permanently, it has produced no evidence to corroborate this assertion. The City also argues that the functional analysis that is required by *Miller* cannot be performed without facts. It points out that in both *Miller* and *Slice of Life*, evidence was presented. In sum, the City maintains that Cornerstone had the burden below to provide sufficient evidence, and it failed to do so. Cornerstone responds that, "the issue of 'handicap' is sometimes examined not only by reference to the characteristics of the *individuals* in question, but also by reference to the criteria for admission to the *facility* at issue." (Cornerstone's Br. at 16 (quoting *McKivitz*, 769 F. Supp. 2d at 822 (emphasis in original)). In other words, an individual can sometimes establish that he or she is handicapped within the meaning of the Fair Housing Act simply by demonstrating that he or she resides in a facility that only admits handicapped individuals.

Despite the City's concerns about the paucity of evidence in the instant matter, the City recognizes that "the parties agreed [that] additional evidence was not necessary to resolve this matter. [(]R.R. at 199a[,)] (Cornerstone's Proposed Findings

39

and Conclusions). It is true that there was such an agreement. . . ." (City's Br. at 14 n.8.) *See supra* note 16. Although the City's concerns with regard to the lack of evidence in this case is well taken, the City waived its argument that the evidence in this case is insufficient. In *Magyar v. Zoning Hearing Board of Lewis Township*, the applicants argued that the trial court erred in failing to obtain testimony from the opposing party as to whether it had knowledge of facts relevant to that case. 885 A.2d 123, 128 (Pa. Cmwlth. 2005). We held that by failing to request the production of additional evidence before the trial court, the applicant waived the argument on appeal. *Id*. (citing Pa. R.A.P. 302(a)). We conclude similarly here. Because the City failed to request the evidence it deemed necessary, and had the opportunity to obtain additional evidence before the trial court, but specifically disclaimed the need for such, its present argument to the contrary is waived. We also note that a party is "without standing to complain of something which he himself was responsible for injecting into the case or, at least, propagating." *Omek v. City of Pittsburgh*, 126 A.2d 425, 428 (Pa. 1956). A party cannot successfully complain of an error of the lower court for which he is himself responsible or to which he has contributed. *Huntzinger v. Wileman*, 45 A.2d 7, 8 (Pa. 1946). *See Zeman v. Borough of Canonsburg*, 223 A.2d 728, 729-30 (Pa. 1966) ("A party may not remain silent and take his chances on a verdict and then, if it is adverse, complain of mere inadequacy which could have been corrected." (internal quotation marks omitted)); *see also United States v. Harris*, 498 F.2d 1164, 1170 (3d Cir. 1974) ("[The defendant] should have taken this course when he learned of the errors, but failed to do so. A defendant may not sit idly by in the face of obvious error and later take advantage of a situation which by his inaction he has helped to create." (internal quotation marks omitted)).

## III. Conclusion

Based on the foregoing, we conclude that Cornerstone's appeal from the Zoning Officer to the Board was not premature, the trial court applied the correct standard of review on remand, and the proposed use fits the definition of a single-family dwelling. Accordingly, the order of the trial court is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

The City of Clairton, PA :
:
v. :
:
Zoning Hearing Board of the City of :
Clairton, PA, and Cornerstone :
Residence, Inc. :
:
Cornerstone Residence, Inc. :
: No. 1757 C.D. 2019
v. :
:
Zoning Hearing Board of the City of :
Clairton, PA and George Glagola, :
City of Clairton Zoning Officer :
:
Appeal of: City of Clairton, PA and :
George Glagola :

## *ORDER*

AND NOW, this 4th day of February, 2021, the October 29, 2019 order of the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
PATRICIA A. McCULLOUGH, Judge